## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MAUREEN SULLIVAN, ) | |
| ) | |
| Appellant, ) | |
| ) | No. 12 C 5819 |
| v. ) | |
| ) | Chief Judge Rubén Castillo |
| THOMAS PATRICK RATZ, ) | |
| AKA EX-TREAM CONCRETE, INC. ) | |
| AKA EX-TREAM CON-CRETE ) | |
| CONCEPTS INC., ) | |
| ) | |
| Appellee. ) | |

## MEMORANDUM OPINION AND ORDER

Maureen Sullivan ("Sullivan") brings this appeal from an order of the U.S. Bankruptcy Court for the Northern District of Illinois discharging the debts of Thomas Patrick Ratz ("Ratz"). For the reasons set forth below, the decision of the Bankruptcy Court is affirmed.

## BACKGROUND

Sullivan is a resident of Aurora, Illinois. (R. 2-28, Trial Tr. at 360.) She has a college degree in business administration and held a management position with a large corporation for approximately twenty years. (*Id.* at 361, 552.) Ratz was a contractor who performed home improvement work. (R. 1, Bankr. Order at 1-2.) Sullivan contacted Ratz in June 2007 to inquire about building an addition for her home after learning about Ratz through a local newspaper. (*Id.* at 1-2.) Sullivan wanted to build a wheelchair-accessible bathroom for her disabled adult daughter. (*Id.*) In August 2007, Ratz met with Sullivan twice at her home to discuss the proposed addition. (*Id.* at 2.) At the second meeting on August 18, 2007, Sullivan entered into an agreement with Ratz, under which Ratz was to build the addition for $33,850, with a down payment of $3,000. (*Id.*)

Their agreement was memorialized on a pre-printed form labeled as a "proposal," which Sullivan signed under the space provided for "acceptance of proposal." (*Id.*) The form bore the letterhead "Ex-Tream Con-Crete," listed the owner as "Ivy D. Ratz," and stated that the company was "Licensed & Insured." (*Id.*) The form was designed for simple concrete projects and had boxes to check for the type of project and materials to be used. (*Id.*) None of the boxes applied to a project of that size, so Ratz handwrote a basic description of the project in the space provided for "additional comments." (*Id.*) The form contained few terms and included no provisions about the timing of the project, subcontracting, permits, or other key details. (*Id.*) Although there was a space for listing the "architect" associated with the project, this was left blank. (*Id.*) The parties also completed an addendum to the contract, handwritten by Ratz, specifying that the contract was contingent upon Sullivan obtaining financing, and providing that if she was unable to obtain financing her deposit would be returned less the cost of the permit. (*Id.*) When the parties signed the agreement, Sullivan gave Ratz a personal check for $3,000 as a deposit. (*Id.*)

Sullivan then applied for funding through a state program and eventually obtained financing through Security Bank. (*Id.* at 3.) The process took longer than expected, however, and she did not receive the financing until February 2009, approximately 18 months after she and Ratz had signed the agreement. (*Id.*) The loan amount from Security Bank was $31,000, which would be released upon submission of escrow disbursement request forms. (*Id.*) The bank made two disbursements to "Extream Concrete" by check. (*Id.*) The first was a check issued on February 24, 2009, for $12,250 shortly before the work began. (*Id.*) It was based on an invoice prepared by Ratz for "framing, footing, wall, stone, excavation, hauling, demolition, and permits." (*Id.*) The second disbursement was issued on March 16, 2009, for $15,750 shortly after the work began. (*Id.*) It was based on an invoice Ratz prepared for "electric supplies and

payment to electric contractor, and ComEd, to purchase all plumbing material and payment to plumbing contractor, to purchase lumber, roof trussels, shingles, metal flashing, payment to carpenter contractors, to pay for all inspections to date and future, and to purchase all tile, flooring paint and fixtures." (*Id.*) When the second invoice was prepared, the work under the first invoice had not yet been completed. (*Id.*) Ratz signed the escrow disbursement, along with Sullivan, authorizing Security Bank to pay him for the scope of the work listed in the invoices. (*Id.*) Ratz understood when he received the money from Security Bank that it was being released from an escrow account. (*Id.*)

Ratz began work on the project in March 2009. (*Id.*) Over a period of two days, he and several workers excavated the site. (*Id.*) Thereafter, several days passed without any further work being done. (*Id.*) Sullivan became frustrated and called Ratz several times to inquire about the status of the project. (*Id.*) He responded that he had other jobs he was working on but that he would be back at her house soon. (*Id.*) At the end of March, Ratz's workers moved an electric line from the garage to the side of the house where the addition was to be built. (*Id.*) In mid-April, Ratz returned with two or three other individuals and moved a shed to make room for the addition. (*Id.* at 3-4.) At some point in April, Ratz informed Sullivan that his father-in-law was dying and that he would not be working on her bathroom for a while because he had to be with his family. (*Id.* at 4.) In mid-May, Ratz or his workers poured the concrete foundation for the addition while Sullivan was not at home. (*Id.*) At the end of May, Ratz brought a Bobcat to Sullivan's house, which he used to push soil against the foundation to fill a gap. (*Id.*) At that time, Sullivan complained to Ratz about the quality of the concrete that had been poured, as it appeared to her to be "wavy" in spots. (*Id.*)

In early June, Ratz returned with a carpenter to discuss the construction of cabinets for the bathroom. (*Id.*) In early July 2009, Ratz informed Sullivan that his sister was ill in Florida and that he was going out of town to be with her. (*Id.*) Several days later, Ratz informed Sullivan that his sister had died. (*Id.*) In late July, Ratz informed Sullivan that he was back in town, but that he had to perform another job to get the money to pay his crew before they could come back to work at her house. (*Id.*)

By July 29, 2009, Sullivan had become frustrated with the delays and terminated Ratz's services by email. (*Id.*) Ratz subsequently asked her several times if he could finish the project, but Sullivan refused. (*Id.*) Two of Sullivan's neighbors, along with an individual who had done some work on the project as a subcontractor, volunteered to complete Sullivan's bathroom. (*Id.*) They had to correct some portions of the foundation that were not level, but they were otherwise able to build on the foundation that Ratz had poured. (*Id.*) It took them roughly six months to complete the project, in part because they only worked on it during their free time. (*Id.*) Sullivan paid for some of the materials that were used but did not compensate these individuals for their time or labor. (*Id.*) In late September or early October 2009, Ratz sent Sullivan a "final billing statement" in which he outlined his various expenses, including payment to a company called "Moser Builders" for subcontracting work. (R. 1-21, Final Billing Statement at 3-4.) According to the statement, Sullivan owed Ratz a balance of $500. (*Id.* at 4.)

After terminating Ratz, Sullivan learned by examining city records that a company called Angel Construction, owned by an individual named Angel Perez, was connected to the project. (R. 1, Bankr. Order at 4-5.) Sullivan had met Perez at one of the meetings with Ratz, and Perez had also been present at her home while some of the work was done. (*Id.*) Sullivan learned that Perez had prepared the drawings for the project—although he apparently was not a licensed

architect—and that he had also obtained the permit from the City of Aurora. (*Id.*) Sullivan did not know if Perez was an employee of Ratz's, a subcontractor, or if they had some other relationship. (*Id.* at 5.) Sullivan also discovered that Angel Construction had an insurance policy issued by a company named Grange Insurance. (*Id.*) She submitted a claim to Grange Insurance after terminating Ratz, but the company denied her claim, advising her that Ex-Tream Con-Crete was not an insured under any policy they had issued. (*Id.*)

Sullivan also learned that Ratz was affiliated with several different corporations. (*Id.*) He owned Ex-Tream Con-Crete Concepts, which was incorporated in Illinois in May 2008 and involuntarily dissolved in October 2009. (*Id.*) Ratz's former girlfriend, Ivy King, owned Ex-Tream Con-Crete, which was incorporated in Illinois in May 2007 and involuntarily dissolved in October 2008.[1] (*Id.*) Ratz's wife, Geneva Saunders Ratz, owned a company called Excellent Concrete Concepts, which was incorporated in February 2009 and remained active as of May 2012. (*Id.* at 5-6.)

In February 2010, Sullivan filed a complaint in the Circuit Court of Kane County, Illinois, alleging breach of contract, fraud, and related claims against Ratz, Ex-Tream Con-Crete, and Ex-Tream Con-Crete Concepts. (R. 1-26, Sullivan's State Compl.) That action was stayed, however, when in March 2010, Ratz filed a petition under Chapter 7 of the Bankruptcy Code. (*See* R. 1, Bankr. Order at 6.) In the bankruptcy proceedings, Ratz claimed that he was an employee of Ex-Tream Con-Crete and Excellent Concrete Concepts. (*Id.*) He claimed that the contract Sullivan entered into on August 2007 was with Ex-Tream Con-Crete, despite the fact that the corporation had dissolved five months before work on the project began. (*Id.*) He also claimed that he performed work on behalf of Ex-Tream Con-Crete Concepts, but he admitted

---

[1] Ratz testified that he did not know why King had listed her name as "Ivy D. Ratz" on the pre-printed forms used by Ex-Tream Con-Crete, as the two had never been married; he surmised that perhaps she had "delusions of grandeur." (R. 2-28, Trial Tr. at 621.)

that the contract was never formally assigned to that company. (*Id.*) Ratz also admitted that he personally received the funds distributed by Security Bank to "Extream Concrete." (*Id.*)

In his bankruptcy schedules Ratz listed two vehicles, and listed his marital status as single. (*Id.*) After the creditors' meeting on April 26, 2010, Ratz filed amended schedules to change his marital status to "married, not filing jointly, with declaration of separate households" and to add five additional vehicles to his schedules. (*Id.*) In his statement of financial affairs, he listed his gross income from employment or operation of a business as $14,000 in 2008; $8,500 in 2009; and $2,000 for 2010 through the date of the petition. (*Id.*)

Thereafter, Sullivan filed an adversary proceeding against Ratz in the bankruptcy case raising five separate claims. (*Id.*) She claimed that Ratz's debt to her was non-dischargeable under 11 U.S.C. § 523 because it was incurred by fraud (Count III), and that discharge should be denied under 11 U.S.C. § 727 because Ratz made false statements (Count IV) and fabricated evidence (Count V) in the bankruptcy proceedings. (*Id.* at 6-20.) She also raised two related state law claims (Counts I and II). (*Id.* at 20-21.) The Bankruptcy Court held a trial on Sullivan's claims over four non-consecutive days in October and November 2011. (R. 2-28, Trial Tr.) In May 2012, the Bankruptcy Court issued an order entering judgment in favor of Ratz on Sullivan's claims under the Bankruptcy Code, and dismissing her state law claims for lack of subject matter jurisdiction. (R. 1, Bankr. Order at 1-22.) Sullivan now appeals.

## LEGAL STANDARD

The Bankruptcy Court's determinations of law are reviewed *de novo*, while its findings of fact are reviewed for clear error. *In re Marcus-Rehtmeyer*, 784 F.3d 430, 436 (7th Cir. 2015); *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 776 (7th Cir. 2013). The clear error standard is "highly deferential," *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011), and "[w]hen there are two

permissible views of the evidence, the [court's] choice between them cannot be clearly erroneous." *First Weber Grp.*, 738 F.3d at 776 (citation omitted). Reversal under this standard is warranted only if the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citation omitted). The Court must be "especially deferential" when reviewing the Bankruptcy Court's credibility determinations, *First Weber Grp.*, 738 F.3d at 776, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson*, 470 U.S. at 575. Thus, credibility determinations "can virtually never amount to clear error." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 848 (7th Cir. 2005) (citation omitted).

## ANALYSIS

Before addressing the merits, the Court must address one procedural matter. After filing her notice of appeal, Sullivan failed to file an appellate brief by the deadline set by the Court. (*See* R. 9, Min. Entry.) Her counsel also failed to appear at a hearing held on August 22, 2012. (R. 15, Min. Entry.) On that date, the Court entered an order dismissing the appeal. (*Id.*) The Court was unaware, however, that Sullivan's counsel had sought an extension of time to file her brief due to a medical issue. (R. 12, Appellant's Mot. for Extension of Time.) At a hearing held on August 28, 2012, at which Sullivan's counsel appeared but Ratz did not, the Court found good cause for the extension and granted counsel's motion. (R. 16, Min. Entry.) That same day, counsel filed a brief on Sullivan's behalf. (R. 18, Appellant's Br.) The Court afforded Ratz, who is proceeding *pro se*, until September 18, 2012, to raise any objections to counsel's oral motion to reinstate the appeal. (R. 16, Min. Entry.) He did not do so by that deadline, or at any time to

date, nor has he ever filed a brief responding to Sullivan's arguments. In the interest of justice, the Court reinstates the appeal and proceeds to the merits.

## I.      11 U.S.C. § 523(a)(2)(A)

A Chapter 7 bankruptcy discharges all debts and other liabilities that a debtor incurred prior to the filing of the bankruptcy petition. *See* 11 U.S.C. § 727(a), (b). The purpose of Chapter 7 is to provide the debtor with a "fresh start." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011) (citation omitted). However, discharge is a privilege and not a right, and it is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 287 (1991) (citation omitted). Thus, there are various exceptions to discharge set forth in Section 523(a) of the Bankruptcy Code, which apply when the debtor has engaged in certain types of misconduct. *See* 11 U.S.C. § 523. These exceptions "are to be constructed strictly against a creditor and liberally in favor of the debtor." *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000) (citation omitted). A creditor bears the burden of proving that an exception applies by a preponderance of the evidence. *Grogan*, 498 U.S. at 287.

As is relevant here, Section 523(a)(2)(A) prohibits discharge of a debt that was "obtained by . . . false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). In order to establish an exception from discharge based on a false pretense or false representation, the creditor must prove that: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010). Because the exception was intended to encompass fraud and not simply breach of contract, "[a] promise constitutes a false representation under § 523(a)(2)(A) only if the debtor made the promise without an intention of ever keeping it." *In re Casali*, 517 B.R. 835,

843 (Bankr. N.D. Ill. 2014); *see also In re Saltzman*, No. 95 B 1522, 1997 WL 539660, at *7 (N.D. Ill. Aug. 22, 1997) ("Nondischargeability cannot be based on a mere failure to keep a promise, such as a mere contractual breach."). In cases involving contractor-debtors, there are generally two ways of meeting this requirement: "by showing that the contractor executed the contract never intending to comply with its terms, or by demonstrating that he intentionally misrepresented his qualifications when soliciting the work." *In re Hernandez*, 452 B.R. 709, 723 (Bankr. N.D. Ill. 2011).

As to the reliance prong, the creditor must prove both actual and justifiable reliance on the false statement or omission. *In re Strauss*, 523 B.R. 614, 629 (Bankr. N.D. Ill. 2014). "Actual reliance means that the omission or misrepresentation was the cause-in-fact of the debt." *Id.* Justifiable reliance, in turn, requires that a creditor not "blindly rely" upon a misrepresentation if the creditor could have discovered its falsity by making even "a cursory examination or investigation." *Ojeda*, 599 F.3d at 717 (alteration and citation omitted).

"Actual fraud" under Section 523(a)(2)(A) has a broader meaning, and while "[n]o definite and invariable rule can be laid down as a general proposition defining fraud," it includes "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (citation omitted). The actual fraud provision was "intended to reach fraud in the inception of a debt"—in other words, "fraud that *created* the debt." *Id.* at 894 (emphasis in original). Regardless of whether the creditor is claiming false pretense, false representation, or actual fraud, the creditor must prove that the debtor "acted with intent to deceive." *Casali*, 517 B.R. at 843. Whether a debtor possessed fraudulent intent "is a question of fact, which is subject to the highly deferential 'clearly erroneous' standard of review." *Davis*, 638 F.3d at 553; *see also In re*

*Sheridan*, 57 F.3d 627, 634 (7th Cir. 1995) ("Whether to infer the requisite intent is left to the bankruptcy court that presides over the case.").

## A.    False Representations and Omissions

Sullivan contends that the Bankruptcy Court erred in rejecting her claim that Ratz's debt to her was incurred through a variety of false representations in connection with his final billing statement, his subcontracting agreement with Moser Builders, his experience, licensing, and insurance, his compliance with building codes, and his misuse of the Security Bank loan proceeds. (R. 18, Appellant's Br. at 50.)

### 1.    Final Billing Statement

Sullivan first argues that the Bankruptcy Court failed to adequately consider the "plethora o[f] inaccuracies in Ratz's Final Billing Statement which exposes his deception." (*Id.*) She points out that the billing statement Ratz gave her in October 2009 listed the wrong contract price, failed to provide a physical address for Ratz's company, misstated the amount of the first escrow draw, lacked underlying documentation, and contained other errors and discrepancies. (*Id.* at 44-45.) Even if she is correct, however, the billing statement was not prepared by Ratz until October 2009—more than two years after the contract was entered. Errors in this document could not establish that Ratz executed the agreement never intending to perform the work, or that he misrepresented his qualifications when soliciting the work. *Hernandez*, 452 B.R. at 723. Because this document was not yet in existence, Sullivan also cannot demonstrate that she actually or justifiably relied on any falsehoods in this document when she incurred the debt. *See Ojeda*, 599 F.3d at 716-17. She has not established error on this ground.

## 2.    Moser Builders

Sullivan relatedly contends that the Bankruptcy Court failed to adequately consider that Ratz lied about having a subcontractor relationship with Moser Builders. (R. 18, Appellant's Br. at 51-53.) In her view, the fact that Ratz "totally fabricated" evidence that he subcontracted with Moser Builders, owned by an individual named Matt Moser, proves that Ratz never intended to build her bathroom. (*Id.* at 51.) However, the record is far from clear that Ratz fabricated the evidence about Moser Builders. Ratz provided documentation in the bankruptcy case, consisting of a fax cover sheet and a letter dated September 7, 2009, which purported to document a verbal agreement between he and Moser to perform work on Sullivan's addition. (R. 2-3, Moser Builders Docs. at 1-3; *see also* R. 2-28, Trial Tr. at 94-102.) Ratz testified that he retained Moser's company to do "some of the framing, the rough framing, electrical, [and] maybe the plumbing" for Sullivan's bathroom, but the project never actually progressed that far. (R. 2-28, Trial Tr. at 80, 94-106.)

In response, Sullivan called Moser as a witness, and he testified that he was never hired to work on her bathroom. (*Id.* at 145-49.) His testimony was somewhat confusing, however, because he admitted that the fax cover sheet belonged to him and agreed that a portion of the document was in his handwriting, but did not recall writing it. (R. 2-28, Trial Tr. at 145-48, 156-57.) He provided confusing testimony on other issues as well. For example, he testified on direct examination that he knew Ratz but had never worked with him, whereas on cross-examination he testified that he had worked with Ratz on a "couple of houses," including a project they had completed in July 2010. (*Id.* at 146, 163-64.) The record also reflects that Moser was having a number of personal difficulties at the time of trial, and he readily acknowledged that he did not want to be a witness in the case and was there only because Sullivan's attorney had subpoenaed

him. (*Id.* at 158-60.) It may well be that this reluctant witness did not want to admit any involvement in the project out of fear that he would become embroiled in the dispute between Sullivan and Ratz.

In any event, the Bankruptcy Court had the opportunity to observe the testimony of these witnesses firsthand, and it found an insufficient basis to conclude that Ratz had fabricated the evidence about Moser Builders. (R. 1, Bankr. Order at 20.) This Court cannot conclude on the basis of the appellate record that Moser's testimony had to be credited over Ratz's. *See First Weber Grp.*, 738 F.3d at 776; *see also Stamat*, 635 F.3d at 979 ("If the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, we will not reverse its factual findings even if we would have weighed the evidence differently." (citation omitted)).

Additionally, even if Ratz did fabricate the evidence about hiring Moser Builders, this type of conduct might be unprofessional or unethical, but it does not necessarily establish fraud for purposes of Section 523(a)(2)(A). The evidence does not pertain to Ratz's qualifications, nor does it show that he had no intention of performing the work when he signed the agreement with Sullivan. *See Hernandez*, 452 B.R. at 723. Regardless of whether Moser's company was involved, there was evidence that Ratz subcontracted with other individuals to work on the project, some of whom actually performed work at Sullivan's home. (*See* R. 1, Bankr. Order at 3-4.) There is also nothing in the record to reflect that Ratz said anything to Sullivan about hiring Moser Builders at the time they signed the contract, or that the involvement of this company had any particular significance to her. Without such evidence, Sullivan has not established that she actually or justifiably relied on any alleged falsehood regarding Moser Builders at the time the

debt was incurred. *See Ojeda*, 599 F.3d at 716-17; *Strauss*, 523 B.R. at 629. She has not

established error on this ground.

### 3.     Experience, Licensing, and Insurance

Sullivan also claims that the Bankruptcy Court failed to adequately consider that Ratz

made misstatements about his experience, licensing, and insurance coverage at the time she hired

him. (R. 18, Appellant's Br. at 53-55.) The Bankruptcy Court did consider these issues, but

determined that they did not establish fraud. (R. 1, Bankr. Order at 9-12.) This ruling is

supported by the record. As to Ratz's experience, Sullivan did not prove that Ratz made any false

statements about his experience in the construction industry. Ratz testified that he had years of

experience working in the construction field and that he had completed more than 1,000

construction projects. (R. 2-28, Trial Tr. at 641.) During his deposition, he testified that his

experience was primarily with concrete and excavation, but that he had attended carpentry school

and completed other room additions. (R. 2-4, Ratz Dep. Tr. at 8-11.) Sullivan did not offer any

evidence to rebut this testimony. She did present testimony from other individuals who claimed

that Ratz did shoddy work on their homes, (*see* R. 2-28, Trial Tr. at 256-80), but this does not

prove that Ratz lied about the number of projects he had worked on or his overall experience in

the construction field.[2] As the Bankruptcy Court concluded, Sullivan also failed to present

evidence regarding any particular license Ratz was required to have but did not.[3] (*See* R. 1,

Bankr. Order at 9.)

---

[2] Sullivan also presented evidence that in October 2010, a few months after Ratz filed for bankruptcy, the Illinois Attorney General filed suit against Ratz and his corporate entities for various state law violations. (*See* R. 18, Appellant's Br. at 12; R. 1-30, Ill. Att'y Gen. Compl. at 2-32.) She does not provide information about the outcome of that case.

[3] Although there was some suggestion that Perez was not a licensed architect, the record reflects that a permit was approved for the project based on Perez's drawings. (*See* R. 2-28, Trial Tr. at 58.) This suggests that the City of Aurora found the drawings sufficient for its purposes. The record is devoid of evidence showing that Perez misrepresented his status to the City of Aurora, or that Ratz was required by law to retain a licensed architect to build Sullivan's bathroom.

As to the insurance, the only type of insurance contemplated by the contract was public liability insurance, and as the Bankruptcy Court pointed out, Sullivan offered nothing to show that this type of insurance would have covered breach of contract damages stemming from Ratz's failure to complete her bathroom in a timely fashion. (*Id.* at 11.) Additionally, although Ex-Tream Con-Crete's pre-printed form made a representation about insurance, "there was no testimony that [Sullivan] even noticed the provision . . . or cared about it when she signed the agreement." (*Id.*) Sullivan admitted that she made no inquiry about the insurance at the time the agreement was entered. (*Id.*) Based on the evidence, Sullivan has not established any material false representations, or that she actually and justifiably relied on any misstatements by Ratz in this regard. *See Ojeda*, 599 F.3d at 716-17; *Strauss*, 523 B.R. at 629.

Additionally, as the Bankruptcy Court observed, even if Ratz was wrong about the insurance coverage, this does not prove that he *knew* there was no insurance covering the project and intentionally misrepresented this fact to Sullivan when they entered the agreement. (*See* R. 1, Bankr. Order at 12.) Ratz testified that he thought Perez's insurance would cover the project, and the Bankruptcy Court found this testimony to be credible. (*Id.*) This Court cannot conclude on the basis of the appellate record that this finding was clearly erroneous. There was evidence that Angel Construction did have insurance and that the company was involved in Sullivan's bathroom project, as it was Perez who prepared the drawings and obtained the permit. (*Id.*) There was also evidence that Perez was present at Sullivan's home on more than one occasion in connection with the work that was done. (*Id.*) Sullivan points to the rejection letter she received from Grange Insurance, but this letter does not necessarily prove that Ratz knew there was no insurance covering the project when they entered their agreement. It only shows that Grange Insurance would not agree to pay Sullivan's claim because she told the company her contract

was with Ex-Tream Con-Crete, and Ex-Tream Con-Crete was not an insured on any policy Grange Insurance had issued. (R. 1-20, Grange Ins. Letter.) The Bankruptcy Court credited Ratz's explanation about the insurance, and given the deferential standard of review, Sullivan has not demonstrated error on this ground.

### 4. Building Codes

Sullivan also argues that the Bankruptcy Court should have found fraud because Ratz failed to comply with applicable building codes when performing the work on her home. (*See* R. 18, Appellant's Br. at 54.) However, as the Bankruptcy Court noted, Sullivan admitted at trial that she lacked evidence showing that any governmental body had determined that Ratz failed to comply with specific building codes. (*See* R. 1, Bankr. Order at 10; R. 2-28, Trial Tr. at 605.) Although there was testimony that the foundation Ratz poured had to be leveled and sealed, the evidence also showed that the foundation was of sufficient quality for the bathroom to ultimately be built on it. (R. 2-28, Trial Tr. at 188, 233.)

Additionally, even if there were building code violations, the question is whether Ratz committed fraud, not simply whether he broke a promise to Sullivan. *Casali*, 517 B.R. at 843. The Bankruptcy Court found no evidence that Ratz falsely told Sullivan he would comply with building codes while having no intention of actually doing so. (R. 1, Bankr. Order at 10.) The evidence suggested that Ratz "might not have been very good at what he did," but the Bankruptcy Court found an insufficient basis to conclude that he had any fraudulent intent when he entered the contract. (*Id.*) This Court cannot say that the Bankruptcy Court's conclusion, which was based on its firsthand observation of Ratz, was clearly erroneous. Ratz's general failure to keep a promise that his work would be of good quality might establish breach of contract, but it does not prove fraud under Section 523(a)(2)(A). *See Davis*, 638 F.3d at 554

15

(contractor-debtor's failure to comply with parties' agreement "establishe[d] only breach of contract, not fraud"); *In re Livermore*, No. 12 A 1689, 2013 WL 1316549, at *4 (Bankr. N.D. Ill. Apr. 3, 2013) ("Typically . . . a debtor's false contractual promise will not support a section 523(a)(2)(A) claim."). She has not established error on this ground.

### 5. Misuse of Loan Proceeds

Sullivan also argues that Ratz's misuse of the loan proceeds he received from Security Bank makes his debt non-dischargeable. (*See* R. 18, Appellant's Br. at 55-56.) In support, she relies on *In re Sheridan*, 57 F.3d 627 (7th Cir. 1995), and *In re Pappas,* 661 F.2d 82 (7th Cir. 1981). (*Id.*) In those cases, the U.S. Court of Appeals for the Seventh Circuit held that when loan proceeds are obtained by the debtor for a specific purpose and the debtor has no intention of using the funds in the intended manner, the debt is non-dischargeable under Section 523(a)(2)(A). *Sheridan*, 57 F.3d at 635; *Pappas*, 661 F.2d at 86. However, those cases dealt with *borrowers* who applied for loans with no intention of using them for the purpose for which they were obtained. *Pappas*, 661 F.2d at 630; *Sheridan*, 57 F.3d at 84-86. In this case, Ratz was not the borrower of the loan; Sullivan was. Thus, *Sheridan* and *Pappas* are not directly applicable.

Even if these cases do apply, Sullivan did not prove that Ratz took the funds with no intention of actually using them to complete her bathroom. His record-keeping and project management skills certainly left something to be desired, but there is evidence in the record that he purchased supplies, lined up workers, and actually performed some work on Sullivan's home. (R. 1, Bankr. Order at 3-4.) He also asked Sullivan numerous times if he could complete the job after she terminated him. (*Id.* at 8.) The Bankruptcy Court determined that Ratz did not intend to commit fraud, and that he did in fact intend to build Sullivan's bathroom. (*Id.* at 7-8.) Although it might have been possible to reach another conclusion based on the evidence, this Court cannot

say that the Bankruptcy Court's determination was clearly erroneous. *See First Weber Grp.*, 738

F.3d at 776; *Stamat*, 635 F.3d at 979.

### B.    Actual Fraud

Sullivan also appears to argue that the Bankruptcy Court failed to adequately consider

whether she proved actual fraud, as opposed to a false representation. (R. 18, Appellant's Br. at

7, 50.) Regardless of whether she was trying to prove actual fraud or a misrepresentation,

Sullivan had to demonstrate that Ratz intended to defraud her when he entered the agreement.

*See McClellan*, 217 F.3d at 893; *Casali*, 517 B.R. at 843. As explained above, the Bankruptcy

Court concluded that Ratz lacked fraudulent intent and instead credited Ratz's testimony about

the reasons for the delays in construction. In the Bankruptcy Court's view, Ratz was "distracted

by other projects, distracted by health issues in his family, and was unorganized and generally

unable to coordinate workers and subcontractors that he retained."[4] (R. 1, Bankr. Order at 8.) The

Bankruptcy Court noted that these excuses "might not have justified his delay"—and may well

have justified Sullivan's termination of the contract—but they tended to show that his actions

were not fraudulent. (*Id.*) It is also notable that the parties' agreement did not include a specific

timeline, and Sullivan admits in her brief that when they entered the agreement "Ratz was vague

about how long the project would take." (R. 18, Appellant's Br. at 16.)

This Court "might view with skepticism" some of Ratz's explanations, but the

Bankruptcy Court "heard all of the testimony and was in the best position to assess [his]

credibility." *Marcus-Rehtmeyer*, 784 F.3d at 436-37. It was not "outside of the realm of reason"

for the Bankruptcy Court to conclude that Ratz did not intend to defraud Sullivan when he

---

[4] Although the Bankruptcy Court did not specifically mention this issue, there was also evidence that part of the delay was attributable to Sullivan being gone for extended periods due to her daughter's many hospital stays. (R. 2-28, Trial Tr. at 627-628.) Ratz testified that the next step in the project involved cutting a large hole in the foundation of Sullivan's home, which in his view posed security concerns if the house was unattended. (*Id.*)

agreed to build the bathroom, particularly where there was undisputed evidence that Ratz asked Sullivan several times if he could finish the project after she terminated him. *Id.* at 437.

This is not to say that the Court is unsympathetic to Sullivan's position. It is apparent from the record that her dealings with Ratz caused her inconvenience and stress at a time when she was dealing with other problems and trying to care for her disabled daughter. It can also be discerned from the record that Ratz has on occasion been unresponsive or performed sloppy work for his customers, including Sullivan. But based on the record, and in light of the deferential standard of review, Sullivan has not demonstrated that the Bankruptcy Court erred in rejecting her claim under Section 523(a)(2)(A).

## II.    11 U.S.C. § 727(a)(4)(A)

Sullivan also argues that the Bankruptcy Court erred in finding in favor of Ratz on her claim under 11 U.S.C. § 727(a)(4)(A), which alleged that discharge should be denied due to false statements Ratz made in his bankruptcy schedules.[5] (R. 18, Appellant's Br. at 56-59.) That subsection provides that a bankruptcy court "shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). This provision exists because the "successful functioning of the Bankruptcy Code hinges both upon the [debtor's] veracity and his willingness to make a full disclosure." *Stamat*, 635 F.3d at 983 (citation omitted). A creditor seeking to have discharge denied under Section 727(a)(4)(A) "must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the

---

[5] In the proceedings below, Sullivan raised a separate claim under 11 U.S.C. § 727(a)(3), alleging falsification of records. (*See* R. 1, Bankr. Order at 18-20.) The Bankruptcy Court found in Ratz's favor on this claim. (*Id.*) Although Sullivan mentions the falsification of records in connection with her claim under Section 523(a)(2)(A), she does not specifically address the Bankruptcy Court's resolution of her claim under Section 727(a)(3) or explain why its ruling was in error. (*See* R. 18, Appellant's Br.) The Court therefore deems this claim abandoned.

statement related materially to the bankruptcy case." *Id.* at 978. As with the other exceptions to discharge, Section 727(a)(4)(A) is construed "strictly against a creditor and liberally in favor of the debtor." *Id.* at 979 (citation omitted). Because direct evidence of a debtor's intent under Section 727 is often unavailable, intent "may be inferred from the circumstances." *In re Krehl*, 86 F.3d 737, 743 (7th Cir. 1996). The determination of intent often turns on an assessment of the debtor's credibility, "making deference to the [bankruptcy] court's finding particularly appropriate." *Id.* "Thus, where the evidence on the intent question is such that two permissible conclusions may rationally be drawn, the bankruptcy court's choice between them will not be viewed as clearly erroneous." *Id.* at 744.

Sullivan argues that the Bankruptcy Court erred in denying her claim because in her view, Ratz made numerous fraudulent statements in his bankruptcy schedules with respect to his vehicles, marital status, residence, income, and other matters. (R. 18, Appellant's Br. at 56-57.)

### A.     Vehicles

Sullivan argues that Ratz made false statements in connection with the vehicles that he owned. (R. 18, Appellant's Br. at 52.) The Bankruptcy Court did not find sufficient evidence of fraudulent intent on this issue, and the record supports this conclusion. (*See* R. 1, Bankr. Order at 14.) In his original schedules (which were prepared by his attorney), Ratz listed certain vehicles. (*Id.*) At the creditors' meeting, he was asked by Sullivan's attorney about five additional vehicles, and he answered questions about those vehicles. (*Id.*) Two days after the creditors' meeting he filed amended schedules listing four of the vehicles as additional vehicles that he owned. (*Id.*) The vehicles had very little value, however; Ratz had equity in only one of them, and even then only $300. (*Id.*) The Chapter 7 Trustee filed a no-asset report after the amended

schedules were filed, which meant that none of Ratz's unsecured creditors were paid even with the addition of the vehicles. (*See id.*)

As to the fifth vehicle, the Bankruptcy Court found insufficient evidence that Ratz actually owned that vehicle. (*Id.* at 15.) This conclusion is supported by the evidence. Sullivan did not present a certificate of title for this vehicle, and instead her primary evidence was a picture of the vehicle parked at Ratz's wife's house, which, as the Bankruptcy Court noted, did not prove that the vehicle was owned by Ratz. (*Id.*) Sullivan claimed that Ratz admitted the vehicle was his at the creditors' meeting, but she failed to submit a recording of that meeting, and the Bankruptcy Court did not find her testimony credible. (*Id.*) This Court cannot say on the basis of the appellate record that its finding was clearly erroneous.

Based on the fact that Ratz quickly corrected the omission of the four vehicles, the limited value of these vehicles, the dearth of evidence demonstrating any intentional misconduct,[6] and the equivocal nature of the evidence regarding Ratz's ownership of the fifth vehicle, this Court cannot conclude that the Bankruptcy Court erred. *See In re Kitson*, 341 F. App'x 234, 237-38 (7th Cir 2009) (debtor's failure to properly identify his wholly-owned corporation, list income from that corporation, and list $6,300 loan he received from his parents did not warrant denial of discharge because there were no assets for distribution, and thus these errors "had no effect on whether any of the unsecured creditors, including [plaintiff], would receive any distribution from the estate"); *In re Hudgens*, 149 F. App'x 480, 488 (7th Cir. 2005) (bankruptcy court did not err in denying claim under Section 727(a)(4)(A) despite substantial

---

[6] Ratz testified at trial that he believed the ownership of these vehicles was a "gray area," but Sullivan's counsel never asked for any clarification of what he meant. (*See* R. 2-28, Trial Tr. at 118, 128.) The Bankruptcy Court found some suggestion that Ratz was confused about whether he needed to list vehicles that were owned by the corporate entities, or that were owned jointly by himself and his wife, since she was not a party to the bankruptcy. (R. 1, Bankr. Order at 14 & n.3.) This assumption was not unreasonable given the various corporate entities involved in this case, and the fact that the Bankruptcy Court, upon hearing Ratz's testimony, concluded that he did not appear to be a "highly educated or highly sophisticated businessman," and that he had little understanding of corporate principles. (*Id.* at 18.)

discrepancy in debtor's statements of his net worth, where evidence showed that statements had been completed "sloppily or carelessly" but not with knowledge that they were false); *In re Hall*, 304 F.3d 743, 749 (7th Cir. 2002) (affirming bankruptcy court's resolution of claim under Section 727(a)(4)(A) where debtor's conduct, "while hardly admirable, was not the sort of egregious conduct that warranted dismissal with prejudice"); *Cantwell & Cantwell v. Vicario*, 464 B.R. 776, 789 (N.D. Ill. 2011) (bankruptcy court did not clearly err in rejecting claim under Section 727(a)(4)(A) where evidence was insufficient to show that the debtor "knowingly and intentionally omitted information from her bankruptcy filings").

## B.     Marital Status and Residence

Sullivan also argues that the Bankruptcy Court erred in declining to find that Ratz fraudulently misrepresented his marital status and residence. (R. 18, Appellant's Br. at 57-58.) The Bankruptcy Court found insufficient evidence to prove any intentional misrepresentation. (*See* R. 1, Bankr. Order at 16.) Again, the record supports the Bankruptcy Court's conclusion. The record shows that although Ratz originally listed himself as "single" when he filed bankruptcy in March 2010, there was evidence that he was separated from his wife at that time and living with his mother. (*Id.* at 6.) When questioned at the creditors' meeting, Ratz acknowledged that he was still legally married,[7] and two days after the meeting he filed an amended schedule correcting his status to "married, not filing jointly, with declaration of separate households." (*Id.*) The Bankruptcy Court noted that because of the declaration of separate households, Ratz was not required to include his wife's income on his schedules in any

---

[7] The record shows that Ratz and his wife separated sometime in late 2009, were together "sporadically" during 2010, and reconciled at some point prior to the trial in October 2011. (R. 2-4, Ratz Dep. Tr. at 8-9; R. 2-28, Trial Tr. at 128-29.)

event.[8] (*Id.* at 15-16.) Therefore, as the Bankruptcy Court noted, "the omission had little impact" on the case. (*Id.*)

Sullivan attempted to prove that Ratz was lying about being separated from his wife when he filed for bankruptcy, but the evidence she offered was weak: she presented a witness who testified that he spoke with Ratz sometime in 2009, and during this conversation Ratz allegedly gestured in the vicinity of his wife's house when asked where he was living. (*Id.*) This witness did not testify that Ratz gave him his exact address or provided other definitive evidence that would prove he was lying about being separated from his wife, and even if this testimony is believed, it would not establish where Ratz was living in March 2010, when he filed bankruptcy.

Sullivan's other evidence consisted of a photograph that she took sometime between April and July 2010 showing a truck with the logo "Ex-Cellent Concrete" parked in front of Ratz's wife's home. (*Id.* at 16.) But Ratz's wife owned Excellent Concrete Concepts and, as the Bankruptcy Court noted, there would certainly be nothing unusual about a vehicle with her company's logo being parked in her driveway. (*Id.* at 15.) Additionally, even if Ratz was using the vehicle, its presence in the driveway on one particular day does not compel the conclusion that he was living there; for all Sullivan knows, Ratz was simply dropping something off for his wife on that date. It might be possible to reach a different conclusion based on the evidence, but in light of the deferential standard of review, this Court cannot conclude that the Bankruptcy Court erred in declining to deny Ratz a discharge on this ground.

## C. Income

Sullivan also argues that Ratz falsely understated his income in his bankruptcy schedules. (R. 18, Appellant's Br. at 58-59.) She points out, for instance, that he listed his gross income in

---

[8] *See* U.S. Bankruptcy Court Rules: Bankruptcy Forms for Individuals, Instructions to Schedule I (Official Form 1061), at 26 (available at http://www.uscourts.gov/file/18169/download) ("If you are separated and your spouse is not filing with you, do not include information about your spouse.").

2009 as $8,500, even though he admitted to receiving approximately $28,000 from Security

Bank in the spring of 2009 to complete Sullivan's bathroom. (*Id.*) She also relies on the

testimony of a witness who said that Ratz told him sometime in 2009 that his business was

"booming." (*Id.*) The Bankruptcy Court found the evidence insufficient to prove intentional or

fraudulent conduct. (R. 1, Bankr. Order at 17-18.) This determination is supported by the record.

As a preliminary matter, the Bankruptcy Court—unlike this Court—had the opportunity

to observe Ratz during his testimony, and it determined that Ratz did not appear to be a "highly

educated or highly sophisticated businessman." (*Id.* at 18.) The Bankruptcy Court further

concluded that, although Ratz had incorporated several businesses, "he did not seem to recognize

the meaning and implications of incorporation, or to even understand how to keep those

corporations from being involuntarily dissolved." (*Id.*) Given the deference that must be afforded

to the Bankruptcy Court's firsthand assessment of the witnesses, this Court cannot say that its

conclusion was clearly erroneous. *See Stamat*, 635 F.3d at 979.

Additionally, as the Bankruptcy Court noted, the fact that Ratz had various construction

jobs did not necessarily mean that income from those jobs was going directly into his pocket. (R.

1, Bankr. Order at 17.) There were numerous corporate entities involved in this case, and

Sullivan did not offer specific evidence to show what amount of profits, if any, Ratz received

from these different corporate entities.[9] Without this type of evidence, it would be difficult to

conclude that Ratz was required to disclose any additional income. *See Kitson*, 341 F. App'x at

237 (profits earned by a corporation are not be treated as income of a debtor-shareholder until

---

[9] The Bankruptcy Court noted that Sullivan never tried to establish that any of the corporate entities involved in this case were Ratz's "alter ego," such that the income and assets of these entities could be treated as Ratz's own. (*See* R. 1, Bankr. Order at 17.) Sullivan does not attempt to raise such a claim here, nor could she, since she did not raise it before the Bankruptcy Court. *See In re Sokolik*, 635 F.3d 261, 268 (7th Cir. 2011) (issue not raised in the bankruptcy court is deemed waived in the district court because "to find otherwise would permit a litigant simply to bypass the bankruptcy court" (citation omitted)).

they are actually distributed). The Bankruptcy Court also found, having observed Ratz during his testimony, that Ratz appeared to have "confused net income, or profit, for gross income, which is required to be disclosed" in the bankruptcy schedules. (R. 1, Bankr. Order at 18.) The record shows that Ratz was disorganized when it came to his finances, but his sloppiness or lack of understanding of business principles does not prove that he intentionally understated his income in order to defraud his creditors. *See Hudgens*, 149 F. App'x at 488. Sullivan has not established error on this ground.

### D. Other Irregularities

Sullivan points to other irregularities and discrepancies in Ratz's schedules, including that Ratz left off the employer identification number for one of his companies, listed Sullivan's attorney rather than Sullivan as a potential judgment creditor, and listed certain creditors in his statement of financial affairs but not on one of his schedules. (*See* R. 18, Appellant's Br. at 58.) Sullivan's filings in the Bankruptcy Court were voluminous and in some instances convoluted; it is not clear that she raised each of these issues with the Bankruptcy Court, in which case they would be waived. *In re Sokolik*, 635 F.3d 261, 268 (7th Cir. 2011). But in any event, the record does not support a conclusion that Ratz knowingly made false statements on these minor issues in order to gain some advantage in the bankruptcy case, or that these discrepancies had any impact on the outcome of the case. *See Kitson*, 341 F. App'x at 237-38; *Hudgens*, 149 F. App'x at 488.

Sullivan also makes a one-sentence argument that Ratz failed to disclose "machinery" on his list of assets. (*See* R. 18, Appellant's Br. at 58.) Again, it is not clear that she raised this argument in the Bankruptcy Court, but assuming she did, she does not cite to any evidence in support of this argument. The only tangential support the Court could locate was Sullivan's

testimony that Ratz told her that he had his own "equipment." (R. 2-28, Trial Tr. at 373.) There was no clarification of what he meant, however, and for all that the record reveals, Ratz was referring to basic equipment such as the shovels he and his workers used to dig the hole for the foundation. (*See id.* at 391.) Even if Ratz was referring to some type of construction machinery, the record is devoid of evidence showing that any such machinery was owned by Ratz personally, as opposed to one of the corporate entities involved in this case. She has not established error on this ground.[10]

## CONCLUSION

For the foregoing reasons, the judgment of the Bankruptcy Court is AFFIRMED. While this Court is sympathetic to the sad circumstances of Sullivan's dealings with Ratz, she has not established any clear error by the Bankruptcy Court during its extensive evidentiary proceedings.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: January 27, 2016**

---

[10] After rejecting Sullivan's federal claims, the Bankruptcy Court dismissed her state law claims for lack of subject matter jurisdiction. (R. 1, Bankr. at 20-21.) Because a discharge was being granted, Ratz's personal liability for any state tort law violations would be discharged upon closure of the case. (*Id.* at 21.) Thus, the state law claims could have no foreseeable "effect on the estate of the debtor," meaning that the Bankruptcy Court had no jurisdiction to adjudicate them. *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) ("[B]ankruptcy courts have no jurisdiction over proceedings that have no effect on the estate of the debtor."); *see also In re Liburd-Chow*, 434 B.R. 863, 867-68 (Bankr. N.D. Ill. 2010) (holding that once discharge was granted, jurisdiction over related state law claims was lacking, because any recovery received would have no effect on the debtor's estate). Sullivan does not assert any specific error in the Bankruptcy Court's resolution of her state law claims, nor can the Court discern any error.